Please all rise. Dearly, we hear you. This Honorable Appellate Court for the 2nd Judicial District is now back in session. The Honorable Susan Chapman Hutchinson presides. Good morning and please be seated. Somebody's a busy person this morning. Your Honor, the prosecution is not concerned with Susan at 22-0447. Laura Pawson, as the administrator of the estate of Chancellor Pawson, deceased plaintiff, v. Q West, Inc., doing business as QR on 2KK Investments LLC, defendant, appellate. Arguing on behalf of his clients, Mr. David M. Maxey. Arguing on behalf of the appellee, Mr. Adam R. Walsh. All right. We're a little late, I believe, but we had a, not a complicated, but an interesting earlier argument. We will give this the appropriate time. And so, Mr. Maxey, if you are ready, you may proceed. Thank you, Your Honor. Please report, counsel. David Maxey on behalf of Q West. We're here after a jury trial in which we allege, or we maintain, that Q West was entitled to a judgment notwithstanding the verdict. And if the court denies that, then we ask for a new trial because of the myriad trial errors that occurred and prejudice which was caused to Q West during that trial. Specifically, the closing argument was, we believe over-the-top and very prejudicial to us. So I will start with my first point is that there was plaintiff's position is that this case is more than a dram shop case. In this case, there's actually a negligence based upon a voluntary undertaking. As we've proven in our brief and the record demonstrates, there was no voluntary undertaking. Why did you submit the instruction? We did not submit that instruction, Your Honor. That was an error in the brief, in the plaintiff's brief. Now, originally, the instruction came in through the plaintiff. There was back and forth. From our perspective, from the defense perspective, didn't want to have a voluntary instruction, voluntary undertaking instruction. But the court decided to think about it overnight, and the court did want that instruction. Defendants made modifications to that instruction, and then that's why it was tendered. Not because there was a waiver, but because it was a foregone conclusion. Is the defendant supposed to just not do anything? We didn't really tender it. I mean, the plaintiff brought it. It was modified by defense. And so we don't believe that's a waiver under the law. Well, why was it still, though, considered? You're saying that it just the other side is considering it, your instruction, or did the trial court actually? Because in post-judgment, wasn't there some discussion about when you submitted the instruction from the judge? Wasn't there a question or a statement that you submitted the instruction? Well, it wasn't submitted. The instructions are clear. I've got them here. Plaintiff Exhibit 24, I believe it was, was their tendered instructions. And then it was modified. And then during that modification, defense counsel made some modifications. And then I may have brought it. I'm not sure. It's unclear in the record. But only after the plaintiff submitted it. It was not defendant's submission of a jury instruction on that issue. Defendant didn't move for summary judgment. Defendant argued that there was no evidence of a voluntary undertaking. However, at that point, when the court was going to do an instruction, there were modifications made. Does counsel object to the instruction? I believe that originally when that instruction was tendered by the plaintiff, trial counsel did object. And that's why modifications were made to it. And do you have a citation to the record where that objection was made? I will bring you that citation on rebuttal, just because I know I have it in my, I have it there. Okay. So there was insufficient evidence. Even no matter what happened, there was no evidence here of a voluntary undertaking. In order to get around, this is a typical dram shop case. This is a case where somebody got intoxicated and injured somebody or killed somebody else. And those cases are brought under the dram shop. You need something other than the ingestion of alcohol, and that's not here. Their only evidence, their only evidence was that they claimed that there was, they claimed there was no evidence of this, that Ms. Holt had said she was going to get out in the parking lot and said, I will give you guys a ride home. They argued about a half hour over that, and they said no. Well, part of what is critical here and in terms of your statement of facts is not highlighted, as maybe it should be, is we've got two hours and 45 minutes worth of activity in the bar consistent with closing the bar, and these two employees come back and help close, allegedly, but apparently there's a lot of drinking going on during that period of time. This should not have happened, correct? Drinking by other, by patrons or by who? No, there weren't any patrons at the bar. There might have been a couple if somebody needed a ride. But these guys had worked, but they checked out at 9 o'clock, 9.30, because it was kind of slow leaving Ms. Gonzalez to manage the bar. They came back and sort of acted as employees. That would be inconsistent with their manual, with their responsibilities, and their help was highlighted by drinking, which would also be inconsistent with the manual and responsibilities. So this goes beyond, I think, a dram shop, per se. They should not have done what they did. Now, what they did, so what happened was, so Mr. Simmons came back and there are videos where he was holding a beer. We didn't see how he got it. There's no evidence that anybody knew that he was taking those beers and drinking them, and I don't know off the top of my head how many he had. Mr. Possum came back, and he just sat to wait for the ride for Mr. Simmons. That's why he came back. I don't know how many, who else was drinking in the bar. I mean, they each get a shift drink is the policy of the place. But that's before the bar closes. It's not after the bar closes, if I understand the manual correctly. Okay, I'm not sure. But the manual itself does not impose a duty of law. So let's be clear on that. The law is what the law is. That manual is not the duty, does not impose a duty. And whether they drink, that again goes right back to the drink shop. So anything that results from that, any injury that occurred because of drinking on the premises would be covered under a drink shop action against the bar. There's no additional, there's nothing under the law or negligence that says that because somebody drank at the bar. But this is after hours. The bar closes at 2. Correct. That must be the city of Plano or the county of Kendall's law that, you know, that's, you've got that closed hour, you don't serve alcohol after that, you don't drink alcohol in that bar after that. There is evidence of drinking in that bar after that, correct? There was evidence from those video shifts. Was anybody else observed in that video drinking or was it just Mr. Simmons with various bottles of beer? I don't recall that. I remember Mr. Simmons. I don't know if anybody else was drinking or if they were finishing up their drinks. But Mr. Simmons was while he was cleaning the bar. But Mr. Simmons should not have been there at that time cleaning the bar because he had already checked out, correct? No, because he came back in and punched back in to do his ball back duties. So he did come back to clean up. That was his duties was to clean up the bar. So that's why he was seen in those videos shaking up the rugs and doing other things within the bar, finishing up what he should be doing, cleaning up behind the bar, sweeping the floor. So he came back to do that. While he was doing that, he did drink. He did take some bottles of beer. I don't know if it was one or two. He could have had the same beer. It's unclear because, you know, the shots of the video that he had one or two beers. But he was doing his duties when he was there. He was cleaning up. That was his job at the bar. And then when it was time to go, they both went outside. Well, where was Ms. – I think her name was Gonzales, not Holt. I'm talking about Ms. Gonzales. Where was she when this was going on? She was doing her duties to close the bar as well. So they had to take the registers and whatever she had to do with the registers and put the liquor back and whatever they do on her duties as the bartender or the manager that night. And, again, Mr. Possum was just waiting for Mr. Simmons. He didn't come back to do anything. But as manager, she should have known, should she not have, that we're not drinking after hours? Anybody's not drinking? We're not supposed to be drinking after hours? Did she let it go on? I don't know that she knew that they were drinking after hours. I'd have to check that in the record. But, yes, I mean, her role there was to get the place ready for closing and to get out of the bar. And Mr. Simmons was cleaning the bar, and other people were doing their duties at the bar. They were entitled to one shift drink. Now, whether it was right before closing, if that was how they were supposed to do it, it was like the end of the day and you get one drink. Maybe they carried that drink after the time. I don't know that. I don't know if the record shows that. But, certainly, that in and of itself does not make this something independent of the provision of alcohol to make the bar liable for that outside of the Dram Shop Act. I don't see that. What about after they are completed with their closing duties, they all leave together, right? And at some point, Gonzalez leaves, right? Does she have any responsibility knowing, just assume for purposes of arguments, that she knows full well that the two individuals are intoxicated and are going to get in a car? Does she have any duty or responsibility whatsoever? Not under the law. There is no duty to restrain somebody who has been drinking from leaving the parking lot. There is no duty to restrain somebody from getting in a car. The law says you can't assist them in that. You can't put them in the car and give them the keys, like in Simmons, and then say, start the car, go, get off our property. They didn't do that. Was there some testimony that Summer Holt drove Simmons to his car? I think that they were, no, I don't believe that's right. I believe they were, their car was by the bar. She got in their car and pulled it over beside their car and said, get in my car. So, yeah, so they were parked there. My understanding is that she got into her car and she pulled around and pulled up beside them, and that's when she got out and said, look, I'm willing to take you home to both of them. You keep saying it's, and especially in reference to Justice Kennedy's question, it's not the law. But the owner of this establishment, TKK or whatever the actual name is, he said that there was an employee manual that basically said how things should be done within that bar and within, I suspect, the other four or five establishments that he said he owned throughout the area. And one of the issues in the manual is to prevent obviously intoxicated guests from driving. Did she, Ms. Gonzalez, try to prevent them from driving, prevent anybody? We don't have anything in this record that indicates, at least I didn't find anything, where she said I don't think you guys should drive home. Well, in addition to that, I think there was a local ordinance to that effect as well. That said, well, the manual, I have it here, that it says that they have there to encourage it, explain ways to prevent guests from driving and drinking. So, you know, we will make a reasonable attempt to prevent obviously intoxicated guests from driving. Well, yes, Gonzalez was leaving, but the shop girl, Summer Holt, regardless of the bar itself, she made extreme efforts to try to prevent them from driving. Who did? Summer Holt. But she's, there's some question about whether she's an employee, but let's talk about the person we know who is an employee. And that is Amanda Gonzalez, or I, Gonzalez I think is her last name. Yes. She's working there beside Mr. Simmons. She, I think, says, well, I didn't really know he was drunk, or I didn't know that he was impaired. I think she might have used impaired. Right. But what, if anything, did she do to determine that? Just look at him? I mean, he came back after they had been out at hard day's night or someplace else within the Plano area, and they came in for maybe last call, shift drink. What did she do to prevent or to make sure that they were okay? Let's put it that way. Well, he went back to work, and he's kind of a clownish type of guy. From the testimony, he was kind of like, he liked to play games or do funny things. And so that was nothing out of the ordinary with his personality. I never considered cleaning a funny game. Well, not cleaning. Definitely, he was picking up those drugs, and he was doing heavy work, mopping the floor, wearing his cap. I mean, he just kind of played around in some of those videos. So she didn't think there was anything out of the normal. And according to Senator Holt, she didn't either. So we have two witnesses that said they didn't really think that he was excessively drunk or anything or intoxicated. And so we have that. And then secondly is these manuals put on themselves. It's 10 o'clock on a Tuesday. Yes, we don't, but it's going to keep coming around. Okay, that's okay. So these manuals do not impose a duty, okay? And they don't have a, there's, I don't know if an ordinance says you have to keep somebody from driving home. I don't know how you can. And the case laws against that, Gustafson, I cite him in the brief, McCowan case, you don't have a duty to take the keys. You don't have a duty. In fact, if you take the keys, that could be problematic, according to their manual, because they consider it tough. But you, there was nothing, there was no duty imposed on the bar to do that. And so when Senator Holt, not an employee, went out there, she did make numerous efforts to stop them from leaving. I don't know what more you could do other than to say, hey, you know, I'm willing to give you a ride home. I mean, she tried. And they refused it. Lots of noise going on here. Justice Kennedy, Justice Jorgensen, anything else in particular? No, no, I'm good. Okay. You will have an opportunity to respond. Thank you. After Mr., I'm sorry, I've forgotten the name now. After Mr. Vaughn. Mr. Vaughn? Yes, thank you. Oh, my Lord. You know, counsel, if it's okay with you, just let's wait a minute. It ends. Unless there's a tornado out there, we shall duck. Do you have that citation? Oh, yes, I do. Actually, we have the citation. That objection of all our indicators. R-9-8-1-0. Did you get that? R-9-9-8-2-1-0. One of us got it, so that's it. All right, thank you. I think it's almost on its last round. I haven't been here on a Tuesday in a long time. I'm usually here Wednesday or Thursday. Well, it's our assurance that Elgin is prepared for whatever emergency should arise. Every Tuesday they test this. Just on the first Tuesday. Am I always here on the first Tuesday of the month? It seems like it's every week. And I'm never here on the first Tuesday. I'm here on Wednesday or Thursday. I think the recording can now pick you up and we can hear you. Thank you, Your Honor. May it please the court, counsel. I'm Adam Vaughn, on behalf of Plaintiff Laura Paustin. QBAR is asking this court to do something remarkable, which is to take a jury's rhetoric in favor of the plaintiff and to either give judgment in J&OV to the plaintiff on the basis of an instruction that the defendant had tendered or to reverse the trial court and give a new trial on the basis of evidentiary rulings that the defendant did not check to. Counsel started by stating that this was not the defendant's instruction, involuntary instruction. I went to my brief. We did just get the citation. I obviously haven't had a chance to look in the record. But in our brief on page 2, citing in the record 783-85, in the post-trial hearing, the court said, in response to who tendered the jury instruction, said, so I don't ask a question I don't know the answer to, so that's what I was leading up to. The instruction that I gave was the defendant's instruction. I'm hard-pressed to understand how that was error because that was given at defendant's request. Did you tender an instruction, a voluntary undertaking instruction, prior to that? There was. I don't believe this is in the record. There was discussion, certainly, because it was raised on summary judgment. And going into the case, that was going to be an issue. My understanding is that the plaintiff did have an instruction, but it wasn't tendered because the defense counsel came up and said we would rather use this one. And then that was what was tendered. So there was a discussion about what language may have been, but I don't believe that was in the jury instruction conference. And certainly there wasn't a plaintiff's instruction, which was objected to, and then a defense instruction tendered with an objection. You know, if there's a point, the defendants, for example, didn't make an objection saying a voluntary instruction is going to be given, it should be this, but we still object. Instead, it was just given, and then the post-trial conference at that time, if the defendant had said, oh, no, that wasn't my instruction, that would have been the time to state it, but the trial court was reviewing everything and was under the impression, and I certainly think the record reflects that, that that was the defendant's instruction that was given. Well, without having the instruction that you have talked about, that there was discussion about it, and having this particular instruction that the judge remembers, which one are we to look to? The judge's memory here, even though there is an objection, no, no, this wasn't our instruction, how do we deal with that? Well, I think you look to the jury instruction conference and see if the defendant tendered an objection or if the defendant objected to a tendered instruction. Because that's the issue, you take voluntary undertaking aside, because, you know, frankly, this issue I didn't see coming. My understanding is very clear that it was tendered by the defendant, but, you know, also plaintiff did tender instructions related to negligence, and the defense didn't object to any of those either. And Judge Waller put the jury instruction conference on the record so that this court, you know, has the full ability to review what was discussed, what objections were made, how they were resolved, if language was massaged, how the parties came to that. So, you know, the answer will lie in the record, but I think it's very clear that the defense had tendered that objection. And so then when the defense tenders that objection, they get into the invited error doctrine, where in Gibbons v. Chicago in September of 23, the Supreme Court reaffirmed that if you inject an error into the trial, you can't on appeal complain of it. I know that the defendant is trying to make the argument that, well, the instruction was improper, but there wasn't enough evidence. But if the defendant tendered the instruction, that's sort of prima facie evidence the defense thinks that there is enough evidence to go to the jury. And then certainly you get into the judge has the ability to tender the instruction, and Judge Waller said regardless who gave it, he thought that the evidence was sufficient for the jury to consider. He said he didn't know what the jury was going to do, but that the evidence was there. To overcome that would then be an abuse of discretion, and then the defense's briefs, they don't state how that was an abuse of discretion, other than they disagree that the evidence was sufficient. But as the court was discussing, you know, there is plenty of evidence to establish that this is voluntary undertaking. You know, there's two theories of liability, dram shop and voluntary undertaking. Dram shop is the exclusive remedy for the provision of alcohol to patrons, but the Supreme Court has stated in the Simmons case and the Walrich case as examples that if there is something that goes beyond the mere provision of alcohol, where you voluntarily undertake to care for the intoxicated person, then you can bring in a negligence claim under voluntary undertaking outside of dram shop. And here in this case, if you look at what happened, there was sufficient evidence. As Justice Hutchinson noted, I mean, the manager was on duty, they're drinking after the bar is closed. They're not supposed to be there. They had clocked out. Chasey Paulson is there stating he needs a ride because he doesn't have a driver's license. They engage in drinking, cleaning, horseplay. I don't know how best to describe that. But at one point, Mr. Simmons is seen on a video lying on the floor for seven minutes, and Ms. Wallenweber, or Gonzalez, walks over him at one point. Then they're pushed out. Wallenweber locks the door and leaves. Then you're left with Summer Holt, who is a shot girl. There's sufficient evidence to show that she was an agent. She was hired through Facebook by the manager. She was described as an employee at trial by Ms. Gonzalez. Mr. Taft, the owner, testified she was an employee, but on cross admitted that in his answers to the interrogatories that she was listed as a former employee. She identified that she had duties beyond just merely giving shots, that she had post-bar closing duties. And then she stayed after. And then the expert testified, and Mr. Taft agreed, that shot girls should have been trained in Bassett. And Bassett also tells you what to do when you're an intoxicated person. So now we're stuck at about 4.30 in the morning, and she has taken it upon herself for half an hour to try to get these two gentlemen into her car to give them a ride. And then what happens is eventually Mr. Simmons says, I think the quote is, to Mr. Paulson, are you going to go with a girl or are you going to get with your boy? Or maybe I'm flipping girl and boy. To which Ms. Holt testified, she says, now is not the time for that. Showing that he's getting antagonized. And there was evidence that she knew he was a poor driver on good conditions, and his car was very fast. And at that point she made the determination, I will follow you. A couple stoplights into Plano. They're at a red light. And then Simmons takes off at a high rate of speed. She can't follow them, and she tries to message them on Facebook. Well, let me just ask a question. I don't mean to interrupt, but how does following them constitute a voluntary undertaking? What's she going to do if they have an accident and she's followed them? But based upon the accident they had, she couldn't have done anything. She couldn't have done anything in following them, but under a voluntary undertaking you're not supposed to increase the risk of harm. How did that increase the risk of harm? Well, basically, again, we're after a trial verdict, and this is on a judgment J-O-V, so there just has to be any evidence. It doesn't necessarily have to be in a courtroom agreement. Any evidence that it increased. Yes. So Simmons, she's asking them for half an hour to get in the car. Simmons is refusing, and finally it appears he becomes irritated and said, are you going to go with the girl or are you going to get with your boy? He gets in, and then when he gets to that stoplight, he takes off. And the evidence is sufficient with reasonable inferences to think that he was annoyed that she was following him and that caused him to go at a high rate of speed through that stoplight, and that ended up being where he missed the turn and had the accident. There's no evidence that he ran a stoplight. Well, no, I'm sorry, from the stoplight. There was a lead to her lane. The evidence wasn't any Florida. So he was annoyed, and that's why he gunned it and sped off. Yes, there's a reasonable inference from the testimony that that's what happened. And that increases the risk for the passenger. Yes, because if somebody, whether intoxicated or not, taking concentration aside, if you take off at a high rate of speed, it's harder to control the car and you have the possibility of going off the road. Certainly the alcohol plays an important factor. The more impaired a person is, the worse a driver they are. But, you know, it increases the risk of harm regardless of whether he was intoxicated or not. Because he was annoyed. Because he was annoyed. Okay. Let me ask, how are we getting – what are we relying on for negligence, I guess, other than the actual activities? Is it the manual that they should have followed? Is it the lack of VASTA training? Is it, as Justice Kennedy has said, maybe the ordinance? You know, what are we relying on in particular that we can put our hands on and say this supports that finding? Sure. Well, the ordinance pertains to Dram Shop, but it also has, you know, obligations that a borrower has to have. But under – for voluntary undertaking, under Simmons and Walcrich, that if you undertake a duty then to care for somebody, then you have a duty to not increase the risk of harm. So in the Simmons case, it was a person who was intoxicated in a bathroom at an adult club and was escorted out into a car and was driven off. And the court found that they, you know, had assumed a duty not – they violated a duty not to increase the risk of harm to other people by promoting him being an intoxicated driver. In Walcrich, a young woman drank alcohol at somebody's house, and then two brothers took on a responsibility to try and care for her. She was thrown up on a shirt. They removed it. They put a pillow under her head so she wouldn't asphyxiate. But they refused to let people call 911, and apparently a father made them take her out, and by the time she got to a hospital, she had passed away. Counsel, sorry to interrupt. But so in those cases, so Simmons, that's the one where he's at a gentleman's club, but the court specifically noted that they didn't serve alcohol. Correct. So it wasn't a dram shop. It wasn't even possible to become a dram shop case. So the voluntary undertaking was to get him out of the place and place him in greater danger by literally bringing his car to him and putting him in the car. Correct. Right? So that's a little distinguishable from what we have here. Ms. Holt did not drive him to the car, unless I misunderstood the facts. No, she did not drive him to the car. All right. And so Wachowicz, the decedent there was helpless, and that really came under a different restatement where the – it doesn't apply here because obviously the decedent and the driver here were not helpless. They refused the offer of help. And then, you know, Lesner is a much older case, but, you know, that's a business invitee, and the duty there is to protect one customer from another unrelated. And so, you know, all the dram shop litigation, all the case law is very strict on this, that it has to be something completely independent of the provision of alcohol. And so I understand what you're saying, that she undertook a duty to take care of him, but did that not expire essentially upon his refusal? It would have, I think. There's a much better argument if they refused and she said okay and then left. It's the additional I'm going to follow you that then increased the risk of harm. So she took the voluntary undertaking to try to get them home. When it was refused, by following them, as I explained with Justice Jorgensen, that there's a reasonable inference from the evidence that that antagonized Mr. Simmons, which increased the risk of harm. So it's not the provision of alcohol, because you're correct. If it's just, you know, whether in Walkeridge or – Walkeridge is a better example. If the decedent had been given alcohol at the social host's house and then walked home and fell down and passed away, there would be no liability because there's no social host liability. It was the additional step of trying to take care of her in a negligent fashion that then rendered them liable under voluntary undertaking. So here it was the negligent act of trying to take this voluntary undertaking that then allowed for the jury to find that there was sufficient evidence that she had done this voluntary undertaking, which made QBAR liable. So if her decision to follow them increased the risk, doesn't it also have to be negligent on her part? Doesn't she have to – don't you have to establish some facts showing that she knew or reasonably should have known that this might increase the risk? Sure. One, she's the agent of QBAR, so it comes back to QBAR. But also, remember, Mr. Taft said that she was supposed to be basset trained because all shotgunners were supposed to be basset trained. Ms. Wallenberger testified that shotgunners were employees and should be trained. Plaintiff's expert on basset said basset explains to you what to do when somebody is intoxicated and trying to leave. That person said you could have called the cops. Ms. Holt said, however, that she wasn't given the basset training or that she wasn't given the manual. And as Justice Hutchison mentioned, the manual has a lot of rules, and counsel read it and says we're going to take reasonable steps to keep people from driving. And as it is, the plaintiff's expert said she was set up to fail because she wasn't given that training. Obviously, she knew there was a problem. She's spending a half an hour out in the parking lot. And I'm not going to sit here that she wasn't trained to do the right thing. But sometimes you do the right thing and I'm doing the wrong thing because you just don't know what to do. No question about it, but the refusal of the decedent and the driver seems to be the cutoff of her voluntary undertaking. But you're saying that by getting behind the wheel to follow him, she irritated Simmons and made it worse. But I think you mentioned the expert. Didn't the expert also say that the dangerous condition here was the perversion of alcohol? Yeah, I mean, of course, you know, if somebody, I mean, when he was .21, I believe, is what the labs came back. I know there's some dispute over the adequacy of the lab. But there's evidence that he was intoxicated well over the legal limit for driving. So obviously that, you know, goes to if a person is intoxicated, you don't want them to get in the car, what do you do? And that's where this all starts to break down because, you know, could have asked the manager or could have called the police if I can finish my answer. And she didn't. Instead, she decided, I will follow you home. So in her mind, she's going to follow them home, I guess, to make sure they get home safely. But by doing that, there's evidence that you can make a reasonable inference from that the jury could have found that that antagonized Simmons, caused him to drive at a higher rate of speed, which increased the risk of harm to Pawson. And so, again, they're asking on a JNOV. It's not even manifest way to the evidence. It's just as long as there's any evidence, then the court has to affirm the verdict. I obviously didn't get into the evidentiary arguments or prejudgment interest, but we would just ask, unless you have questions, of course. No, we'll consider what is in the briefs on that. I just have one question. Is it your position that the failure to object to the instructions, which I think are 16 and 22, unless there are others, but the duty of ordinary care is the one and then the other is the voluntary undertaking. Is your position that the failure of the defense to object to those at trial forfeited the issue? It results in neither of those issues of complaining that the jury was instructed on them. We've identified each of the instructions in the brief on that section, where it's duty, but there's agency, there's scope, there's comparative negligence, which, keep in mind, they got 39%. There was a finding. If they got over 51%, we wouldn't be here because that would have eliminated it. So, really, this all seems like a trial strategy that just missed, and that's kind of the problem on appeal where the defense had a theory and claimed to prevail but shouldn't be able to come on now and say, give us a redo so we can try a different tact. So, unless there's further questions, we ask that you refer. Thank you, Your Honors. Thank you. Thank you very much. And, Mr. Maxey, you may proceed if you wish to. Thank you. So there was no, first of all, with respect to following, the idea of following. Belfer's Hustle, it's similar to that. In Belfer's Hustle, there was a question of whether the parents, they agreed to monitor and to make sure the kids didn't drink and to make sure nobody had any drinks. The court said the monitoring element, that's not a voluntary undertaking, because it's just monitoring. Just like here, she got in the car to follow them. You're not doing anything affirmative to help them. There's nothing she could do by just following them. So that's not a voluntary undertaking, number one. Number two is the plaintiff admitted the only duty here beyond the service of alcohol was a voluntary undertaking. So all the other issues that we've been discussing, they admit, they understand that those issues have nothing to do with a negligence claim. Those issues have to do with a preemption claim. But they do say that the duty here is beyond negligence is the voluntary undertaking. The duty beyond selling alcohol is the independent duty voluntary undertaking. And we say, and we've argued, that there was no voluntary undertaking. And we also argue that even with her following them home, there was no acceptance of that offer. So she said, I'm going to follow you. There's no acceptance of that. So aside from the fact that it's nothing more than the monitoring in the whole case, Bell v. Bell case, that forecloses that argument. The next issue is there's no evidence that the bar was giving Simmons these beers after hours. He was taking them. He grabbed them. They're in the videos. But there's no evidence that anybody was handing them to him or giving them to him. There was no evidence that Gonzales, Will and Weber, the manager, was giving him those beers. And Gonzales herself, again, because the plaintiff admits, the only way you can have a negligence action beyond the dram shop is something independent. Well, Gonzales did not engage in a voluntary undertaking. And so that's out the door. And then whether she acted correctly, that her activity falls under the dram shop act, not a specific or separate negligence claim. And that's supported by Simmons, Broccolik and Trump, that Trump case that we cited in our reply. Well, if these two gentlemen did not clock back in, would they be considered patrons between, what, 2 o'clock and 345 when they walked out the door? I'm a little confused about that. If they did clock in, they might be employees. So they might be outside of dram shop, correct? Correct. But the fact that did they both check in? Did they both clock back in? Well, but by the time this happened, they were no longer. They had clocked out. By the time that they left, they were no longer working at the bar. Well, they clocked out at 9 o'clock or 910. And then they came back in. And definitely, I'm pretty sure that Mr. Simmons did because he went to work. And Mr. Sposna just sat at the bar and waited for him. So they would be controlled by the dram shop. Sposna, because he was sitting there waiting, maybe, and then Simmons as well, because when he got done with his shift, he went, clocked out, and then left. So they were still following. So your position is as soon as you clock out, even though you'd worked there all night, you'd now become a patron? No, no, but he clocked out and left. He left the bar. So Mr. Sposna or Mr. Simmons? Either one. At 345 in the morning, are they patrons or employees? Those two are employees leaving the bar. So they've clocked out and they've left the bar, and now they're so. Okay. And then the issues of the insuring instructions, the whole, this comes down to an issue of duty. It's a question of law. The negligence of voluntary undertaking. First of all, there were objections to the negligence instruction. I guess I could get that aside for you there. And what were we to do then? So there's objections to it. Of course, they're going to give the instruction. I don't believe that waives the issue of law, that's whether there's a duty here. The whole issue is whether there was a voluntary duty undertaken here. That's separate and apart from the dram shop. And this is really, and if you look at the legion of cases, this case falls squarely within the dram shop line of cases. It does not fall into one of those exceptions because there is no voluntary undertaking here. And the idea that she followed them, Belvers Hutzel, I've taken that, but then also the fact that that's sheer speculation as to why. I mean, if you look at the map, and I have it here. You've got it right here. Case Exhibit 12 at E182. I mean, you can kind of see the route that they took. And it was a, like, four or five-mile ride. And at some point along that trajectory, they didn't just peel out of the parking lot. It wasn't as if they got behind and they just peeled off. They got into the town and then he floored it. So there's sheer speculation to say that he was angry or upset, and that's why he floored it to speed away. But the issue is any evidence so that the speculation or just his attitude before they got in the car indicate that he might have. . . I mean, speculation is a reasonable inference from, you know, he was just ticked off. There's no reasonable inference of that. She was trying to get them to come and get in the car with him. She said, come on, Chase, get in the car. And then finally the other guy said, come on, Chase, you're going to ride with her or come with me? And then they leave the bar. She's following them. She follows them through town, and then he speeds off. We don't know why he sped off. He just does. And I don't think that's sufficient evidence. And it was not argued to the jury. It was certainly not brought up until the appeal. So I don't think that speculation is sufficient to overcome a motion for voluntary or J&OB motion. Counsel, I have one brief question just about TKK. So under the Dram Shop Act, the landlord is on the hook. It's no fault. Is that correct? Correct. Okay. So you're objecting to or you're arguing that the inclusion within the general non-Dram Shop tort was erroneous? Correct. Correct. They should not have been included in that. And we're also saying they should not have been there to assess fault because Dram Shop, there's no assessing a fault. It's just your liability. Joined the settlement. Yes. Okay. All right. I just wanted to clarify that. Justice? No. All right. I think we have no further questions at this time. Thank you very much. Thank you both for your argument here this morning. I learned a lot of terms. I know the definition of terms at this point. I'll be using them, but I understand them. And we will take the matter under advisement to issue a decision in due course. And we will now stand adjourned for the day. Thank you. Thank you very much.